**No. 25-30411**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States of America,

*Plaintiff - Appellee*

v.

Deborah Cooper,

*Defendant - Appellant*

On Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:23-CR-131-1

# BRIEF OF APPELLANT DEBORAH COOPER

SARA A. JOHNSON
700 Camp Street
New Orleans, Louisiana 70130
(504) 528-9500
sara@sarajohnsonlaw.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Appellant Deborah Cooper**

| | |
|---|---|
| Trial Counsel | Annalisa Miron, Celia Rhoads, Maura Doherty<br>Federal Defender's Office, New Orleans, LA |
| Appellate Counsel | Sara A. Johnson, New Orleans, LA |

**Appellee United States**

| | |
|---|---|
| Trial Counsel | Brittany Reed, Sarah Dawkins, Michael Trummel<br>U.S. Attorney's Office, New Orleans, LA |
| Appellate Counsel | Kevin Boitmann, Brittany Reed, Megan Roberts, Patrick Barr<br>U.S. Attorney's Office, New Orleans, LA |

**Judges**

| | |
|---|---|
| Jane Triche Milazzo | United States District Judge |
| Karen Wells Roby | United States Magistrate Judge |

*/s/Sara A. Johnson*
Attorney for Deborah Cooper

## STATEMENT REGARDING ORAL ARGUMENT

Deborah Cooper respectfully requests oral argument. The issues raised are fact-intensive and specific to individual counts, even though other counts charge the same offense. Oral argument will aid the Court in parsing the facts pertinent to those counts, and why those counts are different from the unchallenged counts. For example, Counts 3 and 5 charge violations of § 924(c), but this appeal contests Count 3, only.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................ii

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF CONTENTS .........................................................................iv

TABLE OF AUTHORITIES.....................................................................1

JURISDICTIONAL STATEMENT ..........................................................4

STATEMENT OF THE ISSUES...............................................................5

STATEMENT OF THE CASE ................................................................7

A. The district court proceedings. ...................................................7

B. The investigation and facts presented at trial...........................9

SUMMARY OF THE ARGUMENT .......................................................15

ARGUMENT ..........................................................................................17

I. Even under the low standard for a Hobbs Act violation's effect on interstate commerce, the standard exists, and it was not met in this case.........................................................................................17

A. The standard of review is de novo. ..........................................17

B. Congress enacted the Hobbs Act pursuant to its authority to regulate activities that substantially affect interstate commerce. .....................................................................................18

C. The evidence of an effect on interstate commerce was not direct or circumstantial; it was presumed. ..............................20

D. Affirming the Hobbs Act convictions on this record would read the effect-on-interstate-commerce requirement out of the statute. .........................................................................................23

II. There was not sufficient evidence to convict Ms. Cooper of aiding and abetting Count 3. ..........................................................................24

A. The standard of review is de novo.............................................24

B. There was not sufficient evidence upon which to determine that the gun in Count 3 was a firearm. .................................. 25

C. There was not sufficient evidence that Ms. Cooper acted with knowledge of advancing the use of the firearm or facilitated the use of the firearm to sustain her conviction for aiding and abetting Count 3. ................................................................ 29

III. Pending and foreclosed issues concerning § 922(g)(1). .................... 36

A. The standard of review is de novo. ......................................... 36

B. 18 U.S.C. § 922(g)(1) is unconstitutional on its face and as applied to Ms. Cooper [Foreclosed]. ........................................ 36

C. 18 U.S.C. § 922(g)(1) is unconstitutionally vague. [Pending].. 42

D. 18 U.S.C. § 922(g)(1) exceeds Congress's Commerce Clause authority. [Foreclosed] ........................................................... 44

CONCLUSION ........................................................................... 50

CERTIFICATE OF SERVICE ......................................................... 51

CERTIFICATE OF COMPLIANCE .................................................. 51

## TABLE OF AUTHORITIES

**Cases**

*Alderman v. United States*,
562 U.S. 1163 (2011) ............ 46

*Alleyne v. United States*,
570 U.S. 99 (2013) ............ 24

*Barrett v. United States*,
423 U.S. 212 (1976) ............ 29

*Binderup v. Att'y Gen. United States of Am.*,
836 F.3d 336 (3d Cir. 2016) ............ 44

*Drummond v. Robinson*,
9 F.4th 217 (3d Cir. 2021) ............ 39

*In re Winship*,
397 U.S. 358 (1970) ............ 35

*Industrial Union Dept., AFL-CIO v. American Petroleum Institute*,
448 U.S. 607 (1980) ............ 47

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ............ 46, 47, 48, 49

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022). ............ passim

*Range v. Att'y Gen. United States of Am.,*
69 F.4th 96 (3d Cir. 2023) ............ 43, 44

*Rosemond v. United States*,
572 U.S. 65 (2014) ............ 29

*Scarborough v. United States*,
431 U.S. 563, 575 (1977) ............ 45, 46, 48

*Taylor v. United States*,
579 U.S. 301 (2016) ............ 19, 24

*United State v. Robinson*,
119 F.3d 1205 (5th Cir. 1997) ............ 18, 19

*United States v. Alcantar*,
733 F.3d 143 (5th Cir. 2013) ............ 45

*United States v. Avalos-Sanchez*,
975 F.3d 436 (5th Cir. 2020) .......... 19

*United States v. Bowen*,
818 F.3d 179 (5th Cir. 2016) .......... 17

*United States v. Branson*,
139 F.4th 475 (5th Cir. 2025) .......... 42

*United States v. Cockerham*,
162 F.4th 500 (5th Cir. 2025) .......... 43

*United States v. Connelly*,
117 F.4th 269 (5th Cir. 2024) .......... 37, 38, 41

*United States v. Copeland*,
820 F.3d 809 (5th Cir. 2016) .......... 36

*United States v. Cruz-Rivera*,
904 F.3d 63 (1st Cir. 2018) .......... 28

*United States v. Danhach*,
815 F.3d 228 (5th Cir. 2016) .......... 17, 24

*United States v. Fitzharris*,
633 F.2d 416 (5th Cir. 1980) .......... 17, 25

*United States v. Foots*,
340 F. App'x 969 (5th Cir. 2009) .......... 28

*United States v. Hamblin*,
911 F.2d 551 (11th Cir. 1990) .......... 34

*United States v. Hembree*,
165 F.4th 909 (5th Cir. 2026) .......... 40, 43

*United States v. Jackson*,
88 F.4th 596 (5th Cir. 2023) .......... 19, 22

*United States v. Lankford,*
196 F.3d 563 (5th Cir. 1999) .......... 27, 28

*United States v. Lopez*,
514 U.S. 549 (1995) .......... passim

*United States v. Lopez-Urbina*,
434 F.3d 750 (5th Cir. 2005) .......... 30, 33

*United States v. Morrison*,
529 U.S. 598 (2000) .................................................... 20, 23, 49

*United States v. Pettigrew*,
77 F.3d 1500 (5th Cir. 1996) .................................................... 17, 25

*United States v. Seekins*,
No. 21-10556, 2022 WL 3644185 (5th Cir. Aug. 24, 2022) ........... 44, 45

*United States v. Stenger*,
605 F.3d 492 (8th Cir. 2010) .................................................... 29

*United States v. Thomas*,
987 F.2d 697 (11th Cir. 1993) .................................................... 35

*United States v. Thompson,*
454 F.3d 459 (5th Cir. 2006) .................................................... 33

*United States v. Traylor*,
184 F.3d 816 (5th Cir. 1999) .................................................... 27, 28

**Statutes**

18 U.S.C. § 1512(c)(1) .................................................... 7

18 U.S.C. § 1951 .................................................... 5, 7, 18

18 U.S.C. § 921(a)(3) .................................................... 5, 25

18 U.S.C. § 924(c) .................................................... passim

28 U.S.C. § 1291 .................................................... 4

**Other Authorities**

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*,
20 WYO. L. REV. 249, 272-75 (2020) .................................................... 42

Kelly D. Miller, *The Hobbs Act, the Interstate Commerce Clause, and United States v. McFarland: The Irrational Aggregation of Independent Local Robberies to Sustain Federal Convictions*,
76 TUL. L. REV. 1761 (2002) .................................................... 18

## JURISDICTIONAL STATEMENT

Title 28, U.S.C. § 1291 confers jurisdiction to this Court as an appeal from a final judgment of conviction and sentence in the United States District Court for the Eastern District of Louisiana. Appellant timely filed her notice of appeal in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUES

I.

Congress enacted the Hobbs Act, 18 U.S.C. § 1951 pursuant to its Commerce Clause authority, specifically, its power to regulate activities that substantially affect interstate commerce. Courts have since interpreted the "effect on commerce" element of this crime as sufficient even if de minimis. Does that mean federal jurisdiction is properly invoked and proven where, as here, the effect on commerce was not proven, but presumed?

II.

A. A necessary element of the use or carrying of a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c), is the use of a firearm, as defined in § 921(a)(3). The government did not produce the alleged firearm, or any photographs or videos of the perpetrators using the firearm, and the sole witness did not describe the firearm or testify that the firearm was "real." Was there proof beyond a reasonable doubt that a "firearm" was used in Count 3?

II. (cont.)

B. A conviction for aiding and abetting § 924(c)(1) requires the defendant to act with the knowledge or specific intent of advancing the use of the firearm *and* that the defendant took some action to facilitate or encourage the use of a firearm. The sole witness testified that the second, unarmed person (the defendant) stayed by the door during the robbery and said, "watch her." Is there proof beyond a reasonable doubt that the defendant had advance knowledge of the use of the firearm and that she took some action to facilitate or encourage its use in Count 3?

III.

A. Is 18 U.S.C. § 922(g)(1) unconstitutional on its face or as applied to Ms. Cooper? [Foreclosed]

B. Is 18 U.S.C. § 922(g)(1) unconstitutionally vague? [Pending]

C. Does 18 U.S.C. § 922(g)(1) exceed Congress's Commer Clause authority? [Foreclosed]

## STATEMENT OF THE CASE

### A. The district court proceedings.

Deborah Cooper was a 51-year-old roofer in New Orleans. A federal grand jury indicted her on June 30, 2023 with seven counts for participating in two armed robberies of Igor's Bar in New Orleans:

Count 1: Hobbs Act Conspiracy
18 U.S.C. § 1951(a)

Count 2: Hobbs Act Robbery on Feb. 14, 2022
18 U.S.C. § 1951(a) and 2

Count 3: Use of a Firearm during a Crime of Violence on Feb. 14, 2022
18 U.S.C. § 924(c)(1)(A)(ii) and 2

Count 4: Hobbs Act Robbery on Mar. 10, 2022
18 U.S.C. § 1951(a) and 2

Count 5: Use of a Firearm during a Crime of Violence on Mar. 10, 2022
18 U.S.C. § 924(c)(1)(A)(ii) and 2

Count 6: Felon in Possession of a Firearm on Mar. 11, 2022
18 U.S.C. § 922(g)(1) and 924(a)(2)

Count 7: Tampering with a Federal Grand Jury on Mar. 11, 2022
18 U.S.C. § 1512(c)(1)[1]

The government filed a superseding indictment on January 3, 2025 that added a 20-year-old simple burglary conviction as a predicate offense

---

[1] ROA.20-27.

in support of the felon-in-possession count.[2] The original indictment identified only simple possession of drugs predicates.[3]

The three-day trial featured three fact witnesses: Darren Brooks, the bar's owner,[4] and Emily Beck[5] and Vincent Grace,[6] the bartenders present on February 14 and March 10, respectively. The other eight witnesses were law enforcement officers. The district court instructed the jury on both *Pinkerton* and aider-and-abettor liability.[7] The jury returned a verdict of guilty on all counts.[8]

At sentencing, the district court calculated a total offense level of 23 and a criminal history category of IV, for an advisory guideline range of 70-87 months, plus 84 months each for Counts 3 and 5, to run consecutively to each other and to all other counts.[9] The district court sentenced Ms. Cooper to 12 months each as to Counts 1, 2, 4, 6, and 7, to be served concurrently, and to 84 months each as to Counts 3 and 5, to be served consecutively to each other and to all other counts, for a total

---

[2] ROA.319, 323.
[3] ROA.24.
[4] ROA.1354.
[5] ROA.1370.
[6] ROA.1391.
[7] ROA.890, 893.
[8] ROA.909.
[9] ROA.1795-96.

of 180 months imprisonment.[10] The district court also imposed a five-year term of supervised release and ordered mandatory restitution to Igor's bar.[11]

The district court's oral pronouncement of conditions of supervised release referred to the standard and special conditions outlined in the presentence report,[12] which were correctly reflected in the judgment.[13] Ms. Cooper timely appealed.[14]

### B. The investigation and facts presented at trial.

Around 12:00 p.m. on February 14, 2022, two people entered Igor's, a 24-hour, cash-only bar in New Orleans.[15] Igor's followed COVID-era protocols that required patrons to present a vaccination card and wear a mask.[16] The two individuals wore masks, and upon entry, the bartender asked for proof of vaccination.[17] The individuals left and returned a few minutes later.[18] This time, when the bartender asked for proof of

[10] ROA.1807-08.
[11] ROA.1808, 973, 976.
[12] ROA.1809.
[13] ROA.939-40.
[14] ROA.950, 975.
[15] ROA.1376.
[16] ROA.1377.
[17] ROA.1377.
[18] ROA.1377.

vaccination, one of the two pulled out a gun and demanded money.[19] The bartender complied.[20] The second person remained by the door.[21] The robber collected the money and the pair left.[22] The bartender locked the door and called 911.[23] The bartender did not identify the perpetrators or the gun.[24] The bartender described the bar as dark, illuminated in red light, with very little natural light.[25]

Igor's did not have operational security cameras.[26] New Orleans Police Department detectives obtained videos from nearby businesses' security cameras, however.[27] That footage showed two individuals getting out of a Dodge Ram pickup truck a couple of blocks away, walking to Igor's, returning to the truck, again walking to Igor's, and then returning to the truck and departing.[28] The individuals wore face masks and hoodies that concealed any identifying features, except one pulled down the hood and removed the face mask upon returning to the truck.[29]

---

[19] ROA.1378.
[20] ROA.1381.
[21] ROA.1382, 1389.
[22] ROA.1383.
[23] ROA.1383.
[24] ROA.1390-91.
[25] ROA.1378-79.
[26] ROA.1487.
[27] ROA.1486-88.
[28] *See* GX 13A, 12D, 12A, 12B, 8A, 11B, 13D, 13E.
[29] ROA.1514; GX 13D.

Det. Bencik searched NOPD's Field Interview Card system, a searchable database of citizen-police encounters, for a white Dodge Ram pickup truck.[30] He located an encounter on November 12, 2021, about three months earlier, and reviewed the body-worn camera footage from that event.[31] Based on distinctive features of the truck's running boards and the driver's "higher hairline," Det. Bencik developed Deborah Cooper as a suspect.[32] He obtained a search warrant for Ms. Cooper's residence at 2223 Freret St., with a planned execution date of March 14, 2022.[33]

But on March 10, 2022, Igor's was robbed again.[34] Det. Bencik again obtained security camera footage from nearby businesses.[35] The videos showed two individuals wearing hoodies, masks, and blue gloves walking toward Igor's, entering Igor's, and then leaving.[36] Det. Bencik believed that the same white Dodge Ram pickup truck could be seen leaving the

---

[30] ROA.1519.
[31] ROA.1519-20.
[32] ROA.1520-22.
[33] ROA.1526-27.
[34] ROA.1529.
[35] ROA.1533-35.
[36] *See* GX 12E, 12H, 9A, 12G, 12F, 12J.

area on the video.[37] The search previously scheduled for March 14 was moved up to the next morning, March 11, 2022.[38]

During the search, NOPD officers located and arrested Ms. Cooper.[39] They took Ms. Cooper to the Sixth District station where she waited while detectives completed their search.[40] Detectives found several articles of clothing consistent with the clothing worn by the perpetrators on the video footage, $1,200 cash, and a 9mm handgun.[41] Detectives searched the white Dodge Ram pickup truck, parked about a block away, and seized a sweatshirt and blue latex gloves, also consistent with the clothing worn by the perpetrators on the video footage.[42]

After the search, Detectives Bencik and Haw interviewed Ms. Cooper at the Sixth District Station. Most of the interview was inconclusive, at best, with the detectives and Ms. Cooper talking past one another. Concerning the first robbery on February 14, Ms. Cooper told detectives:

> DET. HAW: Was it his idea to do that robbery?

[37] ROA.1547, GX 12J.
[38] ROA.1549.
[39] ROA.1445-47.
[40] GX 52.
[41] GX 25, 26, 29, 30, 31, 38; ROA.1568.
[42] *See* GX 44, 41, 42.

> COOPER: I don't know because I didn't know they was robbing the place.[43]
>
> ***
>
> DET. HAW: Whose idea was the first robbery?
> COOPER: I think it might have been the smaller dude. I don't know. I don't think the older dude–[44]

Cooper then explained that, "I know—I know when I went in before with the other guy, the lady told me I needed to have a vaccine—a vaccination something, or something like that." The interview continued,

> DET. HAW: And then you all walked back around the corner.
> COOPER: Yes.
> DET. HAW: And then you all came back, and the robbery occurred. Who went in?
> COOPER: The guy did. I didn't.
> DET. HAW: Why didn't you go in?
> COOPER: Because I probably didn't know—I probably know that there was something that they was going to do [inaudible].[45]
>
> ***
>
> DET. HAW: When you all walked, that day, when you walked back; what did you put in there? Was it the gun?
> COOPER: No. I never touched the gun.
> DET. HAW: You never touched it?
> COOPER: No.
> DET. HAW: Was it the other guy with the gun?
> COOPER: Yeah.
> DET. BENCIK: Did you see it?

---

[43] GX 52 at 13:45.
[44] GX 52 at 14:17.
[45] GX 52 at 15:12.

> COOPER: [Inaudible], I saw him but I didn't know that they was going to rob nothing. Like I said, I go there all the time, so nothing's [inaudible] the day I actually went in there I think I actually showed my ID and the lady was like, you need your vaccination card. And I was like, okay, I left it at home.[46]
>
> ***
>
> COOPER: I don't really know what happened the first time. I think I just really got caught off guard.[47]

Ms. Cooper made inculpatory statements that gave someone named Mark a ride to Igor's on March 10 and that she wore the "New Orleans" hooded sweatshirt shown on the videos and found in her truck.[48]

At the conclusion of the interview, Ms. Cooper was booked into the Orleans Parish Jail and charged with obstruction of justice, three counts of possession of a firearm by a convicted felon, and two counts of armed robbery.[49] Ms. Cooper remained in state custody for approximately 15 months until federal prosecutors adopted the case and obtained a federal grand jury indictment on June 20, 2023.[50]

---

[46] GX 52 at 16:20.
[47] GX 52 at 17:56.
[48] GX 52 at 19:50.
[49] ROA.1899.
[50] ROA.20.

## SUMMARY OF THE ARGUMENT

Federal courts are courts of limited jurisdiction. When federal prosecutors choose to bring a case in federal court, they have an obligation to prove the elements of the offense that establish federal jurisdiction—they can't just make a State court presentation in federal court. But that's what happened here.

*First*, the government's Hobbs Act presentation neglected the effect on interstate commerce requirement. A "substantial affect on commerce" is the basis for Congress's authority to regular what is otherwise within the province of a State's police power. While courts have lowered the bar, the bar exists, and it was not met here. The government asked the jury to pile inference upon inference, rely on common sense, and assumed knowledge of the origin of Jagermeister and Tanqueray. Federal prosecutors have a duty to prove federal jurisdiction. In this case, that duty was, at best, an afterthought, and one that did not meet even the lowest bar.

*Second*, the government did not adhere to the details necessary to prove a § 924(c) violation. It failed to prove the element that establishes federal jurisdiction—whether the gun was a statutorily defined firearm.

It also failed to offer evidence that Ms. Cooper took some affirmative action to facilitate or encourage her accomplice's use of a firearm during the February 14 robbery. She must have acted with the knowledge or specific intent of advancing the *use of the firearm*; not just the robbery. The link to the firearm is necessary because the aiding-and-abetting-defendant is punished as a principal for 'using' a firearm ... and therefore must facilitate in the 'use' of the firearm rather than simply assist in the crime underlying the § 924(c)(1) violation. This Court should reverse Count 3

*Third*, this appeal raises foreclosed issues concerning Count 6: that § 922(g)(1) is unconstitutional as applied to Ms. Cooper based on her 20-year-old conviction for simple burglary; that § 922(g)(1) is unconstitutional on its face; and that § 922(g)(1) exceeds Congress's power. This appeal also raises an issue pending before this Court in at least two other appeals: that § 922(g)(1) is unconstitutionally vague. Ms. Cooper preserved each of these issues in the court below and raises them here to preserve them for possible further review.

# ARGUMENT

## I. Even under the low standard for a Hobbs Act violation's effect on interstate commerce, the standard exists, and it was not met in this case.

### A. The standard of review is de novo.

When a defendant moves for acquittal in the district court, challenging the sufficiency of the evidence, this Court reviews the district court's denial de novo. *United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016). Appellate review is highly deferential to the jury's verdict, and a verdict is affirmed unless, viewing the evidence and reasonable inferences in light most favorable to the verdict, no rational jury could have found the essential elements of the offense to be satisfied beyond a reasonable doubt. *See United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (citation and quotation marks omitted). Nevertheless, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996). Although the jury may make factually based inferences, "a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980).

Ms. Cooper moved for a judgment of acquittal at the close of the government's evidence, and again at the close of all evidence.[51]

### B. Congress enacted the Hobbs Act pursuant to its authority to regulate activities that substantially affect interstate commerce.

The Hobbs Act penalizes "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery" as well as anyone who "attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section." 18 U.S.C. § 1951(a). Accordingly, a violation requires (1) robbery, extortion, or an attempt or conspiracy to rob or extort (2) that affects interstate commerce. *United State v. Robinson*, 119 F.3d 1205, 1212 (5th Cir. 1997). Despite its broad interpretations today, Congress passed the Hobbs Act for the narrow purpose of criminalizing highway robbery. Kelly D. Miller, *The Hobbs Act, the Interstate Commerce Clause, and United States v. McFarland: The Irrational Aggregation of Independent Local Robberies to Sustain Federal Convictions*, 76 TUL. L. REV. 1761, 1762 (2002).

---

[51] ROA.1719, 1726.

Congress passed the Hobbs Act pursuant to the Commerce Clause; specifically, its power to regulate "those activities having a substantial relation to interstate commerce, ... *i.e.*, those activities that substantially affect interstate commerce." *Taylor v. United States*, 579 U.S. 301, 306 (2016) (*citing United States v. Lopez*, 514 U.S. 549, 558–559 (1995)). Even though Congress's Commerce Clause power is limited to activities having a substantial effect on interstate commerce, courts have lowered the bar such that, to trigger the Hobbs Act, a business's activities need have only a slight effect on interstate commerce. *United States v. Jackson*, 88 F.4th 596, 600 (5th Cir. 2023). "[A] crime's impact on interstate commerce need only be minimal." *Id.* (*citing United States v. Avalos-Sanchez*, 975 F.3d 436, 440–41 (5th Cir. 2020)).

To determine a crime's impact on interstate commerce, courts look to whether "the cumulative effect of all similar instances ... is substantial." *Robinson*, 119 F.3d at 1214. A crime qualifies under the Hobbs Act when it merely "depletes the assets of a commercial enterprise, impairing or delaying its ability to buy goods or services in interstate commerce." *Id.* at 1212. But congressional authority does not extend "to every attenuated effect upon interstate commerce," because "[i]f

accepted, [that] reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *United States v. Morrison*, 529 U.S. 598, 615 (2000). Nonetheless, it appears that the courts have done just that.[52]

### C. The evidence of an effect on interstate commerce was not direct or circumstantial; it was presumed.

Igor's is a cash-only, 24-hour bar and laundromat in New Orleans.[53]

Darren Brooks, the owner of Igor's, testified that to maintain his license with the State liquor office, he had to keep copies of his purchases.[54] The government introduced invoices that Igor's received in February 2022[55] and March 2022.[56] These included invoices from Republic National Distributing Company, New Orleans, Louisiana

---

[52] *United States v. Morrison*, 529 U.S. 598, 627 (2000)(Thomas, J., concurring)("[T]he very notion of a 'substantial effects' test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with this Court's early Commerce Clause cases. By continuing to apply this rootless and malleable standard, however circumscribed, the Court has encouraged the Federal Government to persist in its view that the Commerce Clause has virtually no limits. Until this Court replaces its existing Commerce Clause jurisprudence with a standard more consistent with the original understanding, we will continue to see Congress appropriating state police powers under the guise of regulating commerce.").

[53] GX 17 (body-worn camera footage); ROA.1372.

[54] ROA.1356.

[55] ROA.2078, 2093 (GX 53A, 53B).

[56] ROA.2113, 2128 (GX 54A, 54B).

(liquor); Manuel's Supply Company, Metairie, Louisiana (cups, juice, straws, trash bags, etc.); Frank Silva & Sons, Harvey, Louisiana (cigarettes); Thompson's Packers, Slidell, Louisiana (hamburgers); Sysco, Harahan, Louisiana (foodstuffs); Crescent Crown Distributing, New Orleans, Louisiana (beer); Southern Eagle, New Orleans, Louisiana (beer); and Southern Glazer's of LA, Saint Rose, Louisiana (liquor). Examining Mr. Brooks, the government recognized the intrastate nature of these businesses ("[s]ome of them are local chains, or local establishments"), but stated, "Sysco is a nationwide company," to which Mr. Brooks replied, "[s]ure"[57] and later stated that he did not know whether it was a national distributor,[58] but acknowledge he was aware that Sysco had more than one branch in the United States.[59]

After Mr. Brooks testified that Igor's sold "local beers" like Abita,[60] the prosecutor asked Mr. Brooks if Igor's sold Jagermeister (yes), Tanqueray (yes), and Beefeater (no).[61] There was no testimony explaining what those products were, or their source.

---

[57] ROA.1359.
[58] ROA.1365.
[59] ROA.1369. It's not even clear that the Sysco invoices are exclusively for Igor's, as they also indicate "Check Point Charlie's" as the customer. ROA.2087-91, 2121-23.
[60] ROA.1368.
[61] ROA.1368-69

The bar closed while the police were on scene investigating.[62] But there was no testimony concerning how long that took, or what business, if any, was lost. There was no testimony whether the robbery impaired or delayed Igor's ability to buy goods or services in interstate commerce. To the contrary, Ms. Beck testified that when the bar was robbed around noon, it had been a "very slow day" and she "hadn't sold much of anything."[63]

The government's interstate commerce presentation assumed the jury's familiarity with Jagermeister and Tanqueray—that it knew what they were and, ostensibly, that they were foreign-made. The government did not ask Mr. Brooks if those products were imported, how much of them he sold, or what percentage of his business they comprised. Altogether, the government made no effort to quantify anything: the time the bar was closed, the business lost, or the value of the imported goods regularly sold. *Cf. Jackson,* 88 F.4th at 599 ("The police investigation of this incident caused the Welcome Food Store to shut down for about three hours. As a result, the store claimed … a loss of $600.00 in missed

[62] ROA.1359, 1365.
[63] ROA.1376.

earnings."). It did not establish whether customers came from out of state. Rather, the government ignored its jurisdictional obligation, hoping that the jury would, too.

### D. Affirming the Hobbs Act convictions on this record would read the effect-on-interstate-commerce requirement out of the statute.

The government asked the jury to "pile inference upon inference" to find an effect on interstate commerce "in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. But the Constitution requires a distinction between what is truly national and what is truly local. *Id.* at 568. "The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 617–18.

Over the decades, the courts have held Congress to an exacting standard concerning its Commerce Clause authority; but courts have not held the executive branch to a similarly exacting standard when passing on its enforcement of federal laws and the evidence it must produce to

obtain a conviction under them. If federal prosecutors choose to bring a case that is well within the State's police power to federal court, it must show due respect to the Constitution by proving beyond a reasonable doubt facts that support federal jurisdiction, *viz.*—an effect on interstate commerce. *Taylor,* 579 U.S. at 316-17 (Thomas, J., dissenting)(*citing Alleyne v. United States*, 570 U.S. 99, 104 (2013) ("[T]he Government in a Hobbs Act robbery case (at least one that involves only intrastate robbery) must prove, beyond a reasonable doubt, that the defendant's robbery itself affected interstate commerce.").

Not so here. The government presented no evidence that Ms. Cooper actually obstructed, delayed, or affected interstate commerce when she aided and abetted the robberies of Igor's. This Court should reverse Ms. Cooper's Hobbs Act convictions in Counts 1, 2, and 4, because the government has not carried its burden to prove that the robberies affected interstate commerce.

## II. There was not sufficient evidence to convict Ms. Cooper of aiding and abetting Count 3.

### A. The standard of review is de novo.

This Court reviews a preserved claim challenging the sufficiency of the evidence de novo. *Danhach*, 815 F.3d at 235. While this review is

deferential, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *Pettigrew*, 77 F.3d at 1521. Although the jury may draw factually based inferences, "a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *Fitzharris*, 633 F.2d at 422.

Ms. Cooper moved for a judgment of acquittal at the close of the government's evidence, and again at the close of all evidence.[64]

### B. There was not sufficient evidence upon which to determine that the gun in Count 3 was a firearm.

A conviction under 18 U.S.C. § 924(c)(1) requires the use of a "firearm"—not just any gun. The statute defines a "firearm" as:

> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3). As the government's expert firearm witness explained, one cannot assume that a gun is a firearm, it must be inspected.[65]

---

[64] ROA.1719, 1726.
[65] ROA.1673.

None of the surveillance videos captured the gun used in the February robbery. There was no evidence to link the firearm seized on March 11 to the February robbery, either. Ms. Beck, the bartender on duty, did not describe the gun, or identify the gun seized as the one used. She did not testify to her familiarity with firearms. She explained that the bar was dark, illuminated with red light, and very little natural light.[66] The strongest testimony was in response to the government's question, "[w]ere you certain it was a firearm?" To which Ms. Beck responded, "[a]bsolutely, yeah."[67]

When the gun at issue is not introduced as evidence, there must be some evidence—testimony, photographs, video—to support this critical (and jurisdictional) element. Ms. Beck's response was not sufficient.

This Circuit's jurisprudence, admittedly, presents a rocky road for Ms. Cooper. Even though the presence of a firearm, as defined by the statute, is the jurisdictional hook for the federal prosecution of an otherwise State crime, courts have set the bar to meet that hook

[66] ROA.1378-79.
[67] ROA.1391 (As Ms. Beck was not an expert witness, her agreement with the prosecution's use of the term firearm, as opposed to gun, was insignificant, and there was no foundation laid distinguishing between the two.).

exceptionally low. But none of the cases have affirmed evidence as thin as that here.

*United States v. Lankford,* 196 F.3d 563 (5th Cir. 1999) addressed what constituted sufficient evidence to establish that a real firearm was used. *Id.* at 576. Lankford was convicted of violating § 924(c). *Id.* At trial, the government did not admit an actual gun into evidence, and the victim testified that she did not know whether the weapon Lankford was carrying was in fact a "real" gun. *Id.* But she also testified that she believed the gun was real, and this was sufficient evidence from which the jury could have drawn the same conclusion. *Id.*

In *United States v. Traylor*, 184 F.3d 816, 1999 WL 499604, at *19 (5th Cir. 1999), this Court found sufficient evidence from which a jury could conclude that the gun was designed to fire since the gun was admitted into evidence in plain view of the jury, two witnesses specifically identified the weapon and testified that it was a "shotgun," a shell was observed in the chamber of the weapon, and there was no evidence that the gun did not meet the statutory definition or that it was a toy, replica, or model. *Id.*

And in *United States v. Foots*, 340 F. App'x 969, 975 (5th Cir. 2009), although the Government did not admit an actual gun into evidence, and the victim testified at trial that he did not know much about guns, he also testified that the guns appeared real to him. *Id.* Upon being held up, the victim told the robbers to take the money, and ran to a nearby business to call 911. *Id.* Based on *Lankford*, this testimony was sufficient evidence from which the jury could have found that the gun was real. *Id.*

Unlike *Lankford* and *Foots*, however, the government did not ask Ms. Beck if she believed the gun was "real," only whether she was certain it was a firearm. Devices can look like a real handgun, and fire through compressed air mechanisms, but not meet the definition of a "firearm."[68] And unlike *Traylor*, no witness identified the gun allegedly used in the February 14 robbery. *Compare also United States v. Cruz-Rivera*, 904 F.3d 63, 69 (1st Cir. 2018) (evidence sufficient where carjacking victim testified that she knew the difference between a pistol and a revolver, that the defendant's gun was a pistol, and that it looked exactly like a black pistol that law enforcement found in the defendant's home after his arrest and introduced as evidence at trial); *United States v. Stenger*, 605

[68] *See* ROA.1674-76.

F.3d 492, 504 (8th Cir. 2010) (evidence sufficient where jury scrutinized surveillance videos frame-by-frame and four bank employees testified that they observed the gun at close range).

Section 924(c) was born of the Gun Control Act of 1968. *See* 18 U.S.C. §§ 921-928. The federal basis for this offense is to regulate the interstate transfer of firearms. *Barrett v. United States*, 423 U.S. 212, 215 (1976). It is not too much to ask, then, to require proof beyond a reasonable doubt of a firearm, as defined by the statute. There is not such proof here, and this Court should reverse Ms. Cooper's conviction on Count 3.

### C. There was not sufficient evidence that Ms. Cooper acted with knowledge of advancing the use of the firearm or facilitated the use of the firearm to sustain her conviction for aiding and abetting Count 3.

A person aids and abets a crime when he intends to facilitate that offense's commission. "An intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged—so here, to the full scope (predicate crime plus gun use) of § 924(c)." *Rosemond v. United States*, 572 U.S. 65, 76 (2014) (citations omitted). An unarmed accomplice cannot aid and abet a § 924(c) violation unless he has foreknowledge that his

confederate will commit the offense with a firearm. *Id.* at 78. That means knowledge at a time the accomplice can do something with it—most notably, opt to walk away. *Id.*

To prove aiding and abetting a § 924(c)(1) offense, the prosecution must show that the defendant acted with the knowledge or specific intent of advancing the *use of the firearm*. *United States v. Lopez-Urbina*, 434 F.3d 750, 758 (5th Cir. 2005) (citation omitted). There must be proof that the defendant performed some affirmative act relating to the firearm. *Id.* (citation omitted). A defendant's knowledge of the underlying offense or knowledge that a gun will be used in the commission of the underlying offense is not sufficient to sustain a conviction. *Id.* There must be evidence that the defendant took some action to facilitate or encourage the use or carrying of a firearm. "The link to the firearm is necessary because the defendant is punished as a principal for 'using' a firearm ... and therefore must facilitate in the 'use' of the firearm rather than simply assist in the crime underlying the § 924(c)(1) violation." *Id.* (citation omitted).

The critical question here is whether there is evidence to support a finding that Ms. Cooper took some affirmative action to facilitate or

encourage her accomplice's use of a firearm during the February 14 robbery. Accepting the evidence in the light most favorable the government—that Ms. Cooper was the second, unarmed person that drove the gunman and accompanied him to Igor's—the evidence surrounding this robbery comes from three sources: Ms. Beck, the bartender; the surveillance video of nearby businesses showing two persons exiting Ms. Cooper's truck, walking to Igor's, and then returning to her truck; and Ms. Cooper's statements to detectives.

Ms. Beck testified that while a man pulled out a gun, "the other person stayed on the other side of the bar and pretty much told the person who had me to watch me, 'watch her, watch her, watch her.'"[69] That person remained by the door.[70] When the person with the gun took her to the back of the bar, Ms. Beck did not notice anything about the person who was standing by the door.[71] She "didn't even think to look" and couldn't say whether the person remained at the door at that time she

[69] ROA.1378.
[70] ROA.1379, 1387, 1389.
[71] ROA.1382.

was taken to the back.[72] Her statements to the 911 operator concerned physical descriptions and not any actions of the non-gunman.[73]

The surveillance videos from nearby business depicted the robbers' ingress and egress and did not contain any sound. Nor was it apparent that either person possessed a gun in the videos. Concerning the first robbery on February 14, Ms. Cooper told detectives:

> DET. HAW: Was it his idea to do that robbery?
> COOPER: I don't know because I didn't know they was robbing the place.[74]
>
> ***
>
> DET. HAW: Why didn't you go in?
> COOPER: Because I probably didn't know—I probably know that there was something that they was going to do [inaudible].[75]
>
> ***
>
> DET. HAW: When you all walked, that day, when you walked back; what did you put in there? Was it the gun?
> COOPER: No. I never touched the gun.
> DET. HAW: You never touched it?
> COOPER: No.
> DET. HAW: Was it the other guy with the gun?
> COOPER: Yeah.
> DET. BENCIK: Did you see it?
> COOPER: [Inaudible], I saw him but I didn't know that they was going to rob nothing. Like I said, I

[72] ROA.1382-83.
[73] GX 3B.
[74] GX 52 at 13:45.
[75] GX 52 at 15:12.

> go there all the time, so nothing's [inaudible] the day I actually went in there I think I actually showed my ID and the lady was like, you need your vaccination card. And I was like, okay, I left it at home.[76]
>
> ***
>
> COOPER: I don't really know what happened the first time. I think I just really got caught off guard.[77]

Ms. Cooper's statements did not establish advanced knowledge that a gun would be used. And, they do not support proof, or even an inference, that she "performed some affirmative act relating to the firearm." *Lopez-Urbina*, 434 F.3d at 758. At best, her statements are inconclusive.

In *United States v. Thompson,* 454 F.3d 459, 466 (5th Cir. 2006), this Court held that the limited circumstantial evidence that Carter knew a gun was being used in the first of two robberies was not sufficient and reversed his conviction for brandishing a firearm during a robbery. "A reasonable trier of fact could conclude that Carter participated in both robberies and that he knew a gun would be used in the *later* crime." *Id.* (emphasis added). As for Ms. Cooper, "knowledge that a gun was used in the second robbery, however, is not conclusive evidence of knowledge that

[76] GX 52 at 16:20.
[77] GX 52 at 17:56.

it would be used in the first." *Id.* Thus, "[a] reasonable trier of fact would have to conclude that a reasonable doubt existed" that Cooper knew that a gun was used in the first robbery. *Id.* (citation omitted).

Even if a defendant was intimately involved in the robbery, *i.e.*, the defendant drove the co-defendant to the bank for purposes of committing the robbery, the government must prove that the defendant knew his co-defendant would use a gun in the commission of the robbery. *See, e.g., United States v. Hamblin*, 911 F.2d 551, 557 (11th Cir. 1990), *cert. denied*, 500 U.S. 943 (1991) (vacating conviction because the government had presented insufficient evidence to prove that defendant knew his co-defendant would use a gun in the commission of the robbery, even though defendant was intimately involved in the robbery and drove the co-defendant to the bank for purposes of committing the robbery).

Like Cooper, Hamblin made a statement to police. He wrote,

> I dropped Jones off and waited for him to go inside and get the money. Jones was wearing a long sweater coat and ski mask and was carrying a gun in his pants pocket.... After [Jones got] inside the bank, I heard a shot fired. Shortly afterwards Jones came running out....

911 F.2d at 558. The Eleventh Circuit explained, "[i]ntuitively, a reasonable jury might conclude that Hamblin had to know about the gun

beforehand, because it would be difficult to rob a bank without a weapon." *Id.* The government, however, had to prove that Hamblin shared the criminal intent of his co-defendant with respect to the firearm charges, and failed to produce any evidence at trial other than Hamblin's signed statement, which the Court found "inconclusive." *Id.* It vacated Hamblin's conviction on this count, explaining that "intuition cannot substitute for admissible evidence when a defendant is on trial," *id.* (*citing In re Winship*, 397 U.S. 358, 363–64 (1970)), nor can charges under § 924(c) be proven through "guilt by association," *id.* at 558 n.4. *See also United States v. Thomas*, 987 F.2d 697, 702 (11th Cir. 1993).

The evidence was not sufficient to sustain aiding and abetting a § 924(c)(1) offense. The prosecution was required to show that Ms. Cooper acted with the knowledge or specific intent of advancing the *use of the firearm*; not just the robbery. There is not evidence to support a finding that Cooper acted with the knowledge of advancing the use of the firearm, or that she took some affirmative action to facilitate or encourage her accomplice's use of a firearm during the February 14 robbery. This Court should reverse Count 3.

## III. Pending and foreclosed issues concerning § 922(g)(1).

### A. The standard of review is de novo.

Each of the following constitutional claims were preserved in the district court.[78] This Court reviews preserved challenges to the constitutionality of federal statutes de novo. *United States v. Copeland*, 820 F.3d 809, 811 (5th Cir. 2016).

### B. 18 U.S.C. § 922(g)(1) is unconstitutional on its face and as applied to Ms. Cooper [Foreclosed].

Count 6 should be reversed because 18 U.S.C. § 922(g)(1) violates the Second Amendment, both facially and as applied to Ms. Cooper. These issues are currently foreclosed by circuit precedent, but Ms. Cooper raises them here to preserve them for further review. *See United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) (foreclosing facial challenge); *United States v. Schnur*, 132 F.4th 863, 870-71 (5th Cir. 2025) (foreclosing as-applied challenge with respect to burglary conviction).

#### 1. The *Bruen* framework.

The framework for analyzing the constitutionality of firearm regulations is rooted in the Second Amendment's text and history. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19-24 (2022). "[W]hen

[78] ROA.188, 378.

the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17, 24. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

*United States v. Rahimi* reaffirmed that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 602 U.S. 680, 692 (2024). "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (*quoting Bruen*, 597 U.S. at 29) (alteration in original). "Why and how the regulation burdens the right are central to this inquiry." *Id.*

In this Circuit, "'[w]hy' and 'how' a regulation burdens the right presents two separate questions." *United States v. Connelly*, 117 F.4th 269, 273 (5th Cir. 2024). As to "why," "if laws at the Founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons

fall within a permissible category." *Id.* at 274 (quoting *Rahimi*, 602 U.S. at 692). As to "how," "a law . . . may not be compatible with the right if it [is regulated] to an extent beyond what was done at the Founding[,]" "*even when [that] law regulates arms-bearing for a permissible reason.*" *Id.* (*quoting Rahimi*, 602 U.S. at 692) (alterations and emphasis in original). "The challenged and historical laws are 'relevantly similar' if they share a common 'why' and 'how': they must both (1) address a comparable problem (the 'why') *and* (2) place a comparable burden on the right holder (the 'how')." *Id.*

"It is the government's burden to demonstrate that [a] challenged regulation is 'relevantly similar' to laws our tradition is understood to permit . . . by finding and explicating 'historical precursors' supporting the challenged law's constitutionality." *Connelly*, 117 F.4th at 274 (citations omitted). While the government may rely on "analogous historical regulation[s]" and need not identify a "historical twin," a court must always "hold the government to its heavy burden, as the Second Amendment 'is *not* a second-class right.'" *Id.* (*quoting Bruen*, 597 U.S. at 70)(emphasis in original). There are limits to analogical reasoning: "[A]nalogical reasoning under the Second Amendment is neither a

regulatory straightjacket nor a regulatory blank check." *Bruen,* 597 U.S. at 30. Thus, "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021))(alteration in original).

Following *Bruen* and *Rahimi*, this Court held that persons convicted of felonies—like Ms. Cooper—are among "the people" protected by the Second Amendment and that "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Diaz,* 116 F.4th at 466-67; *see also Schnur*, 132 F.4th at 867 ("As to [*Bruen*'s] first inquiry, [the appellant] is unequivocally among 'the people' protected by the Second Amendment."). "Thus, the burden now rests with the Government to show that regulating [Ms. Cooper's] possession of a firearm is 'consistent with the Nation's historical tradition' of disarming someone with a criminal history analogous to his." *Schnur*, 132 F.4th at 867 (quoting *Bruen*, 597 U.S. at 24); *see also Diaz*, 116 F.4th at 467.

### 2. Section 922(g)(1) is unconstitutional as applied to Ms. Cooper.

The original indictment identified a 2007 conviction for possession of cocaine and a 2018 conviction for possession of methamphetamine as predicate felonies for Count 6, the § 922(g)(1) violation.[79] After a motion to dismiss cast doubt on the validity of these predicates[80]—and rightfully so, *see United States v. Hembree*, 165 F.4th 909, 910 (5th Cir. 2026)—the government filed a superseding indictment that added a 2004 simple burglary conviction as a predicate felony.[81] After *Hembree*, the simple burglary conviction is the only predicate left to support Count 6.

Under *Diaz* and *Schnur*, that conviction rendered § 922(g)(1) constitutional as applied to her, foreclosing her as-applied challenge. *Schnur*, citing *Diaz*, ruled burglary to be a theft-related offense, and disarming a defendant convicted of such an offense fit within our Nation's tradition of regulating firearms. 132 F.4th at 870-71. Ms. Cooper seeks to preserve this issue for further review, however, because she respectfully disagrees that the historical analogues and reasoning that

---

[79] ROA.24.
[80] ROA.188,
[81] ROA.323.

*Diaz* and *Schnur* relied on are consistent with Supreme Court precedent, and urges that both cases were wrongly decided.

#### 3. Section 922(g)(1) is unconstitutional on its face.

For the same reasons, Cooper also urges and seeks to preserve for further review that § 922(g)(1) is facially unconstitutional, which she acknowledges is currently foreclosed by *Diaz.* There is no historical support for *permanently* prohibiting firearm possession by all felons. *See Rahimi*, 602 U.S. at 692 ("Even when a law regulates arms-bearing for a permissible reason . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding."); *see also Connelly*, 117 F.4th at 274. Rather, the historical evidence shows that the type of regulation contained in § 922(g)(1) is wholly inconsistent "with the principles that underpin our regulatory tradition," and therefore the statute violates the Second Amendment. *Rahimi*, 602 U.S. at 692.

It was not until the 20th century that legislatures began to pass categorical, permanent firearms bans—eventually expanding those bans to include all persons who have ever been convicted of a criminal offense punishable by imprisonment for a term exceeding one year, *i.e.*, present-day "felons." *See* Joseph G.S. Greenlee, *The Historical Justification for*

*Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 272-75 (2020). Accordingly, § 922(g)(1)'s permanent firearm prohibition for all so-called "felons"—including, specifically, "felons" like Cooper—is inconsistent with the Nation's historical traditions and thus violates the Second Amendment.

Ms. Cooper respectfully urges that this Court should revisit its historical analysis in *Diaz* and its progeny, including *Schnur*.

### C. 18 U.S.C. § 922(g)(1) is unconstitutionally vague. [Pending]

Even if § 922(g)(1) is constitutional under the Second Amendment, Count 6 should be reversed because the statute is unconstitutionally vague under the Fifth Amendment's Due Process Clause and violates separation of powers principles. It does not appear that this Court has addressed this claim in a preserved posture.[82]

Although § 922(g)(1)'s text purports to permanently divest all felons of their Second Amendment rights, that is not what the statute now means, nor can it under *Bruen*. Courts have avoided striking down

---

[82] In *United States v. Branson*, 139 F.4th 475, 479 (5th Cir. 2025), this Court rejected an unpreserved vagueness challenge on plain-error review. Ms. Cooper's claim, however, is preserved, and therefore reviewed de novo. This issue has been briefed in at least two pending criminal appeals: *United States v. Curtis Squire*, No. 25-30324, and *United States v. Michael Celestine,* No. 25-30506.

§ 922(g)(1) in its entirety by deeming it constitutional or unconstitutional on a case-by-case basis, *i.e.*, as applied to certain subsets of felons or even to individual felons.[83] As Judge Higginson recently observed in *Hembree*, "[o]ur caselaw strives to bring coherence to the felony-by-felony approach, but the challenge remains that certain predicate felonies have not yet been adjudged." 165 F.4th at 913.

Under this ongoing, piecemeal approach, some felons will be deemed outside the scope of § 922(g)(1)'s reach, while others will face prosecution. An ordinary citizen cannot know who falls into which camp. That leaves those with a prior felony who wish to possess firearms with no option but to guess how courts might resolve § 922(g)(1)'s applicability to their specific convictions, based on yet-to-be-produced historical evidence. *United States v. Cockerham*, 162 F.4th 500, 517 (5th Cir. 2025) (Higginson, J., dissenting) ("Almost twenty million Americans have felony convictions. Thus, I am even more cautious about our court's piecemeal approach to the § 922(g)(1) landscape, which provides little notice to these Americans of the serious recidivism consequences they

[83] *See, e.g. Range v. Att'y Gen. United States of Am.,* 69 F.4th 96, 103-06 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range,* 144 S. Ct. 2706 (2024), *on remand*, 124 F.4th 218 (3d Cir. 2024); *Diaz*, 116 F.4th at 470 n.4; *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024).

could face.”).

The result is an untenable choice for many citizens: risk liberty and a felony conviction, on the one hand, or forfeit the Second Amendment right, on the other. The Constitution does not tolerate such a choice. Reading § 922(g)(1) to save it from one constitutional peril (wholesale invalidation under the Second Amendment) has now exposed it to another (a due process violation under the Fifth Amendment). *See Binderup v. Att’y Gen. United States of Am.*, 836 F.3d 336, 410-11 (3d Cir. 2016) (Fuentes, J., concurring in part and dissenting in part); *Range*, 69 F.4th at 132 (Krause, J., dissenting) (citation omitted). The result is that this flawed statute is unconstitutionally vague.

### D. 18 U.S.C. § 922(g)(1) exceeds Congress’s Commerce Clause authority. [Foreclosed]

A final constitutional defect also requires this Court’s attention: § 922(g)(1) exceeds Congress’s authority to regulate interstate and foreign commerce. This argument is presently foreclosed. *See United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022)(unpublished).

Article I, § 8 of the Constitution provides: “Congress shall have power . . . To regulate Commerce with foreign Nations, and among the

several States, and with the Indian Tribes ….” *United States v. Lopez*, established the test for the scope of Congress's power to regulate activities that “affect” interstate commerce: “[T]he proper test requires an analysis of whether the regulated activity ‘substantially affects’ interstate commerce.” 514 U.S. at 559.

*Lopez* seemed to, but did not expressly, overrule the more permissive test for federal regulation of gun possession articulated in *Scarborough v. United States*, which required only the “minimal nexus that the firearm have been, at some time, in interstate commerce.” 431 U.S. 563, 575 (1977). A fair reading of *Scarborough* suggests that the case was concerned with statutory interpretation and did not purport to resolve any constitutional issues. *See United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc). This Court, however, has adhered to the view that *Scarborough*'s “minimal nexus” is sufficient *both* to prove guilt under § 922(g)(1) *and* to bring an act of firearm possession within Congress's constitutional power to regulate commerce. *See, e.g., United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

If *Scarborough* is a constitutional decision, then it grants the federal government unlimited power to regulate the affairs of American citizens. *See Alderman v. United States*, 562 U.S. 1163, 1167 (2011) (Mem.) (Thomas, J., dissenting from denial of certiorari) ("[T]he lower courts' reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit on the commerce power."). Any physical object has almost certainly crossed a state line at some point in the past. To hold that this past travel grants Congress a perpetual right to regulate what someone does or does not do with that object—including whether someone merely possesses (even constructively) that object—is to eliminate any limitation on Congress's power. *But see Nat'l Fed'n of Indep. Bus. v. Sebelius [NFIB]*, 567 U.S. 519, 557 (2012) ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.").

*NFIB* supports the conclusion that *Scarborough* is irreconcilable with *Lopez.* In *NFIB*, Chief Justice Roberts noted that "[a]s expansive as our cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as

reaching '*activity*.'" 567 U.S. at 551 (emphasis added). This limitation on the Commerce Clause power to regulation of "activities" is a "distinction between doing something and doing nothing [which] would not have been lost on the Framers, who were 'practical statesmen,' not metaphysical philosophers." *Id.* at 555 (quoting *Industrial Union Dept., AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 673 (1980) (Rehnquist, J., concurring in judgment)). Four other Justices echoed Chief Justice Roberts's analysis of the reach of the Commerce Clause, stating that Congress could only regulate "*activity* affecting commerce[.]" *NFIB*, 567 U.S. at 658 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) (emphasis added).

Yet, § 922(g)(1) criminalizes firearm *possession* without any requirement of *economic activity*, exceeding Congress's Commerce Clause authority. As emphasized in *NFIB*, the Commerce Clause permits Congress to regulate only activities, *i.e.*, the active participation in a market. But § 922(g)(1) criminalizes *all* firearm possession—so long as the firearm was shipped, transported, or received in interstate commerce at some point in the past, however remote—without requiring that the

possession constitute an economic activity. The statute sweeps too broadly.

Congress cannot regulate a person's activity consistent with the Commerce Clause unless that person is "currently engaged" in the relevant market. *NFIB*, 567 U.S. at 556-57. "An individual who bought a car two years ago and may buy another in the future is not 'active in the car market' in any pertinent sense." *Id.* at 556. The same is true for firearms—without more, one who merely possesses a firearm "is not 'active in the [firearm] market' in any pertinent sense." *Id.* This is even more true when the facts present only constructive possession of a firearm. Therefore, *NFIB* overruled the notion that a firearm which has previously passed through interstate commerce should be considered to affect interstate commerce indefinitely without "concern for when the [initial] nexus with commerce occurred." *Scarborough*, 431 U.S. at 577.

Thus, the Supreme Court's modern Commerce Clause jurisprudence makes clear that § 922(g)(1) is unconstitutional. The statute fails to satisfy *Lopez* and *NFIB*'s Commerce Clause analysis because it does not require that the defendant be currently engaged in economic activity that substantially affects interstate commerce—

something more substantial than mere possession of an item that crossed state lines at some remote or even unknown point in the past. In the absence of such a requirement, the Supreme Court has found federal criminal statutes to violate the Commerce Clause, without pausing to consider whether the defendant's conduct might have affected commerce. *See Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 607. Accordingly, § 922(g)(1) is unconstitutional, and Count 6 should be dismissed.

Even if this Court were to construe § 922(g)(1) consistent with *Lopez* and *NFIB*, the motion to dismiss should have been granted nonetheless because the indictment alleged that Ms. Cooper "did knowingly possess a firearm . . . said firearm having been in and affecting interstate commerce."[84] But nowhere did the indictment allege that Ms. Cooper's possession constituted an economic activity; that she was currently engaged in the relevant market; or that the activity substantially affected interstate commerce. Nor did the evidence at trial establish those necessary elements that should have been required for the activity in this case to fall within the ambit of Congress's regulatory power under the

[84] ROA.323.

Commerce Clause. At a minimum, the statute as applied to her violates the Commerce Clause.

For these reasons, Count 6 should be reversed.

## CONCLUSION

There is little doubt that a crime occurred. This appeal asks the Court to examine whether the federal government, in bringing to bear the resources and power of the federal government, met its burden to prove facts to support federal jurisdiction. It did not. Federal courts are courts of limited jurisdiction, and that jurisdiction demands respect. Ms. Cooper appeals to this Court to demand that respect and reverse her convictions on Counts 1, 2, 3, and 4.

SUBMITTED BY:

*/s/Sara A. Johnson*
SARA A. JOHNSON
LA. BAR NO. 31207
SARA A. JOHNSON, ATTORNEY AT LAW, LLC
700 Camp Street
New Orleans, Louisiana 70130
(504) 528-9500
sara@sarajohnsonlaw.com

## CERTIFICATE OF SERVICE

This certifies that I filed the foregoing brief electronically using the CM/ECF system that automatically sends a notice and a copy to all counsel of record.

Dated: March 4, 2026

*/s/Sara A. Johnson*
Sara A. Johnson
Attorney for Deborah Cooper

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1: this document contains 8,874 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Word for Microsoft Office 365 in Century Schoolbook 14-point font.

*/s/Sara A. Johnson*
Sara A. Johnson
Attorney for Deborah Cooper